**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA

v.                                    Criminal No. 3:07cr51

DEMARL TYRON STEWART


**MEMORANDUM OPINION**

This case is before the Court on DEFENDANT'S MOTION TO
SUPPRESS (Docket No. 12).  For the reasons set forth below,
the motion will be granted.

**PROCEDURAL BACKGROUND**

Police encountered Stewart near a convenience store.
The police eventually searched Stewart and discovered drugs
and a gun.  After the police arrested Stewart, he told them
he had been dealing drugs.  On the strength of the gun,
drugs, and his own statements, Stewart was charged with
possession of cocaine base with intent to distribute it and
with possession of a firearm in furtherance of drug
trafficking activity.  Stewart moved to suppress the
evidence as the fruit of a seizure that violated his rights
under the Fourth Amendment.

On May 14, 2007, the Court held a hearing on Stewart's
motion to suppress.  The principal evidence offered at the

hearing were the testimony of Officer Watson, who searched
and arrested Stewart, photographs offered by the Government
and the defense, and a copy of a letter from the
convenience store on police file requesting police
enforcement against trespassers.   After the hearing, the
parties were directed to submit supplemental briefs
discussing (1) at what point Stewart was seized during the
encounter, and (2) whether the police, at the time they
seized Stewart, reasonably suspected that he had committed
or was committing a crime.

### FACTUAL BACKGROUND

The events in question took place in front of a
convenience store located near Robinview Drive and Broad
Rock Road in Richmond, Virginia.   On January 13, 2007, at
around 6:00 p.m., Officers Watson and Kielb were in a
marked patrol car traveling west on Broad Rock Road.[1]   Kielb
drove.

As one heads west on Broad Rock Road, one passes 36th
Street, and then a block later Robinview Drive intersects

---

[1]     Transcript of Hearing on Motion to Suppress, <u>United
States v. Stewart</u>, 3:07cr51-01 (E.D. Va. May 14, 2007)
(hereinafter "Tr.") at 8, 35.36.   Watson could not remember
whether the officers had been driving along Broad Rock Road
continuously, or whether they had turned on to Broad Rock
Road from 36th Street.   Tr. at 50.

Broad Rock Road from the left.  Def. Exs. 3, 4, 7, 8;
Google Maps, http://www.google.com/maps (last visited June
27, 2007).[2]  From the intersection of Broad Rock Road and
36th Street to the intersection of Robinview Drive, the
right-hand side of the road contains a row of public
housing apartments, a strip of grass and weeds, and a B&S
Food Mart convenience store.   The row of apartments
occupies about two-thirds of the block.  Def. Exs. 4, 7, 8.
The strip of grass and weeds contains a chain-link fence
that separates the apartment lot from the convenience store
lot.  The fence, which is perpendicular to Broad Rock Road,
runs from the rear of the lot (or at least, out of view
from the street) to within a few feet of the sidewalk.
Def. Exs. 2, 3, 8.  The fence is approximately six feet
high, and bushes and other vegetation grow in it to make a
sort of privet hedge.  Def. Exs. 1, 2, 3, 9.   The

---

[2]   Fed. R. Evid. 201 permits courts to take judicial
notice of generally known facts "capable of accurate and
ready determination by resort to sources whose accuracy
cannot reasonably be questioned."  Fed. R. Evid. 201(b).
Part (c) of the Rule permits courts to take judicial notice
of facts whether the parties request it or not, and courts
have taken judicial notice of facts gleaned from internet
mapping tools.  See, e.g., State v. Rush, 639 S.E.2d 809,
812 n. 6 (W. Va. 2006) (Google Maps); Gordon v. Lewistown
Hospital, 272 F. Supp. 2d 393, 429 n. 34 (M.D. Pa. 2003)
(Mapquest); In re Extradition of Gonzalez, 52 F. Supp. 2d
725, 731 n. 12 (W.D. La. 1999) (Mapquest).

convenience store sits at the intersection of Robinview Drive and Broad Rock Road.[3] In front of the store, there is a parking lot that affords parking for the store's customers. Def. Exs. 1, 2, 3. The convenience store occupies the right half of a one-story building; the left half of the building is a laudromat. Def. Exs. 5, 6. Perpendicular (as opposed to parallel) parking spaces line the front of the building. Id. There are roughly four parking spaces in front of the laundromat, and five in front of the convenience store. Id. The doors to the convenience store and the laundromat are located roughly at the center of the building, so that they are only a few feet apart and are separated by the width of approximately one parking space. Id.; Gov't Ex. 1.

Watson testified that he had been assigned to the area around the convenience store for several months; that, from experience, he knew the area to be a high drug trafficking area; and that there had been reports from the store about suspected or known activities that involved both drugs and guns. Tr. at 6-8, 26, 52. The building in which the convenience store was located had "No Trespassing" and "No

---

[3]    Robinview Drive "Ts" into Broad Rock Road, and the convenience store sits at the top of this T. If Robinview Drive continued onward, the convenience store would be roughly in its path. See Def. Exs. 3, 7; Google Maps.

Loitering" signs posted, see Gov't Ex. 1, and Watson testified that he believed that the store's owner had formally asked the police to enforce no trespassing ordinances at the store.  Tr. at 27.

Watson testified that, as he and Kielb drove west down Broad Rock Road, it was dark outside.  Tr. at 50.  As they drove past 36th Street approaching the intersection with Robinview Drive and the convenience store,[4] Watson testified that he saw two men (who turned out to be Stewart and a companion, Jason Alston) standing in front of the building. Tr. at 9.  Watson initially estimated that he saw Stewart and Alston from a block and a half away, Tr. at 10-11. However, he also testified that, although the fence separating the apartment complex from the convenience store had obstructed his view, Tr. at 37, 38-39, he saw the men from about one block away.  Tr. at 38.  Watson also stated that his view of the front of the convenience store was roughly the same view depicted in the photographs presented by the defense.  Tr. at 51.  The photographs show that a person driving down Broad Rock Road toward the convenience store would not have a clear view of the front of the convenience store and laundromat until the person had

---

[4]    The record contains no evidence about the lighting in the front area of the store.

traveled almost all the way past the apartment complex, and was within a few yards of the entrance to the store's parking lot.  See Def. Exs. 1, 2, 3, 7, 8, 9.  In any event, Watson observed the two men standing in front of the store only for a couple of "seconds." Tr. at 39.  Taken as a whole, the record supports that statement and refutes the assertion that the officers saw Stewart and Alston from a block or more away.

As Watson approached the store in his patrol car, Stewart and Alston were facing each other to the left of the convenience store, in front of the part of the building occupied by the Laundromat which, At the time, the laundromat was closed.[5] Tr. at 10.  Watson, who at the time had been on the police department for around four and a half years, Tr. at 5, testified:

> Q   [W]hat, if anything, did you see these two males doing when you first saw them in the area of that laundromat[?]
> A   They were just standing on the side of the laundromat.   Looked like they were just facing each other, just hanging out.
> Q   All right.   Did either look like they were, had just stopped or were about to leave?
> A   Not in my opinion.

---

[5]   The exact location of the men in front of the laundromat is not clear.  Watson testified only that the men were on the left side of the building, in front of the laundromat.  Tr. at 10.

Tr. at 10.  Watson further testified that it "[d]idn't look like they were walking to the store or from the store. They were talking and standing in front of a closed business."  Tr. at 40.  Watson testified that he did not draw this conclusion because Stewart and Alston were both black, nor because of the way in which they were dressed. Tr. at 41.[6]

The officers pulled into the store's parking lot. They did not activate their emergency lights.  According to Watson, when Stewart and Alston looked up and saw the patrol car, they immediately changed what they were doing. Tr. at 12.  Alston began to walk toward the convenience store's entrance.  Tr. at 11.  Stewart "kind of did an about face" and started looking at flyers posted in the laundromat's windows.  Tr. at 11, 13.  For reasons neither explained nor readily apparent, Watson testified that Stewart's reaction (turning around and looking at the flyers) made him suspect that Stewart was involved in drug activity.  Tr. at 41.

The officers pulled into a parking space in front of the two men.  Both officers got out of the car.  Watson

---

[6]    Other than the fact that Stewart had on a hat and a jacket, there is no evidence in the record about what type of clothing the men wore.

approached Stewart. Kielb overtook Alston, who was walking away from the scene towards the convenience store's entrance. Tr. at 12. Watson testified that "[Alston] was kind of going towards back [sic] into the store. We stopped him," Tr. at 12:8-10, and that "I believe the guy that was entering into the store, [Kielb] stopped him. [Kielb] [s]aid, we need to talk to you," Tr. at 12:16-18, and [Kielb] "brought [Alston] back" from the store's entrance towards Stewart and Watson. Tr. at 45.

As Kielb intercepted Alston and brought him back from the convenience store's entrance, Watson approached Stewart and began to question him. Watson asked Stewart what he was doing, and Stewart replied that he was waiting for his friend, indicating the store. Tr. at 13. Stewart had in his hands a "Black and Mild," which Watson described as a "thin cigar." Tr. at 13. Stewart had removed the tobacco from the cigar, and was attempting to replace it. Tr. at 13-14. Watson testified that this was a common practice: smokers of the cigar commonly empty the tobacco, remove a paper filter that some believe can cause cancer, and then replace the tobacco. Tr. at 14-16. According to Watson, this technique is also used to insert marijuana into the cigar, Tr. at 55, but Watson did not say that he suspected

Stewart of that activity.  Stewart had the cigar in one hand, and loose tobacco in the other.  Tr. at 14.  Watson estimated that it would have taken Stewart "a minute or so or more," standing still, to perform this operation.  Tr. at 54.

As Stewart was attempting to replace the tobacco, Watson saw that Stewart was shaking visibly, id., and appeared to be very nervous.  Tr. at 17.  This led Watson to become concerned that Stewart would flee, so he re-positioned himself.  Tr. at 18.  In response, Stewart turned his right side away from Watson. Tr. at 18.  He also appeared to be clutching his right side.  Tr. at 17.  Watson became concerned for his safety, and ordered Stewart to turn around so that he could search him for weapons.  Tr. at 18.  Stewart complied, and Watson patted down Stewart's lower body, finding nothing.  Tr. at 18-19.

The police officers then demanded identification from Stewart and Alston.  Alston handed them identification; Stewart gave them his name and social security number.  Tr. at 19.  Kielb ran the information in the patrol car's computer.  The record check revealed no adverse information about Alston and he was told to leave.  Tr. at 19.  Stewart, however, had an outstanding arrest warrant.  Tr.

at 19-20.  The officers arrested Stewart, and searched him again.  They discovered a gun hidden on the right side of Stewart's upper body, and drugs hidden in Stewart's cap. Tr. at 20.  Stewart was then read his <u>Miranda</u> rights, and confessed that he was dealing drugs.  Tr. at 22-23.

Stewart now moves to suppress the evidence secured in the search and the confession.  He argues that the police seized him without a reasonable, articulable suspicion that he was engaged in criminal activity, and that the evidence, as a fruit of that unconstitutional seizure, cannot be used against him.

<b>DISCUSSION</b>

The Fourth Amendment protects persons from unreasonable "seizures."  <u>Elkins v. United States</u>, 364 U.S. 206, 222 (1960).  For the seizure at issue here to be reasonable, the police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," reasonably warrant a police officer in believing that criminal activity was afoot. <u>Terry v. Ohio</u>, 392 U.S. 1, 21, 30 (1968).  If police seize a person without such a "reasonable suspicion" and as a result discover incriminating evidence, the Fourth Amendment generally forbids the government from using that

evidence to prosecute the person.  See Nardone v. United States, 308 U.S. 338, 241 (1939).[7]  However, if police discover incriminating evidence during an encounter with a person that does not amount to a seizure, then the Fourth Amendment's protections do not apply, and the courts do not analyze whether the police had a reasonable suspicion to justify their encounter with the person.  Florida v. Bostick, 501 U.S. 429 (1991).  The parties agree that the police seized Stewart during the encounter, but they do not agree when, during the encounter, the seizure occurred. Because Watson made additional observations about Stewart as the encounter progressed, the parties disagree about which of Watson's observations provide the foundation for the seizure.

Therefore, the analysis of Stewart's suppression motion proceeds in two steps.  First, it is necessary to determine when Stewart was seized.  Second, the issue becomes whether, at the time Stewart was seized, the police had a reasonable, articulable suspicion that Stewart was involved in criminal activity.

---

[7]   Of course, there are exceptions such as the inevitability doctrine, see Nix v. Williams, 467 U.S. 431 (1984), but the record does not indicate that any exceptions apply here.

**A.    When Did the Seizure Occur?**

A seizure implicating the protections of the Fourth Amendment occurs when a police officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen such that he is not free to walk away." Terry, 392 U.S. at 19.  The parties here agree that Watson seized Stewart no later than when he first patted Stewart down.[8]   Stewart, however, argues that he was seized earlier, by the officers' "show of authority" when Kielb stopped Alston and brought him back from the store's entrance, and Watson simultaneously approached Stewart and began questioning him.

The Supreme Court recently noted that, "when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not." Brendlin v. California,

---

[8]    See Government's Supplemental Response to Defendant's Motion to Suppress (Docket No. 21) at 4; Defendant's Supplemental Response [sic] to Defendant's Motion to Suppress (Docket No. 22) at 9.  Indeed, that is the law in this circuit.  See United States v. Burton, 228 F.3d 524, 527 (4th Cir. 2000) ("[P]olice officers may not place their hands on citizens 'in search of anything' without 'constitutionally adequate, reasonable grounds for doing so.'" (quoting Sibron v. New York, 392 U.S. 40, 64 (1968)). Accord United States v. Davis, 202 F.3d 1060 (8th Cir. 2000) ("Terry leaves no doubt that a pat-down search is a seizure.").

127 S. Ct. 2400, 2405 (June 18, 2007). That test was formulated in United States v. Mendenhall, 446 U.S. 544 (1980), in which Justice Stewart's principal opinion held that a seizure occurs if, "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." 446 U.S. at 554; see Brendlin, 127 S. Ct. at 2405 (quoting passage as the proper test); United States v. Wilson, 953 F.2d 116, 121 (4th Cir. 1991) (quoting Mendenhall). Furthermore, when a person might not want to leave encounter for reasons unrelated to the presence of police, the Supreme Court noted that the proper way to conduct the Mendenhall inquiry is to ask whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Brendlin, 127 S. Ct. at 2405-06 (quoting Bostick, 501 U.S. at 435-36); Wilson, 953 F.2d at 122 (quoting Bostick). Put differently, "the crucial test is whether . . . the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Bostick, 501 U.S. at 437 (quotations omitted). Under this inquiry, a person is seized when a reasonable person in his shoes would conclude from the officer's conduct that "his attempt to leave the scene"

would be "likely to prompt an objection from the officer . . . ." Brendlin, 127 S. Ct. at 2407.

This "seizure" inquiry has three features relevant here. First, it is an objective test. It does not turn on the subjective belief of the defendant, nor on the subjective intentions of the officer. See California v. Hodari D., 499 U.S. 621, 628 (1991) (holding that the standard "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.").

Second, to determine whether a reasonable person would have felt free to leave, the inquiry "tak[es] into account all of the circumstances surrounding the encounter . . . ." Bostick, 501 U.S. at 437. Application of the "totality of the circumstances" test involves the assessment of "numerous factors," including, but not limited to:

- the time, place and purpose of the encounter,
- the words used by the officer,
- the officer's tone of voice and general demeanor,
- the officer's statements to others present during the encounter,
- the threatening presence of several officers,
- the potential display of a weapon by an officer, and

- the physical touching by the police of the citizen.

United States v. Weaver, 282 F.3d 302, 310 (4th Cir. 2002) (citing Bostick, 501 U.S. at 437; Michigan v. Chesternut, 486 U.S. 567 (1988); Mendenhall, 446 U.S. 544 (1980)).

Finally, "an unintended person may be the object of the detention," so long as the detention is the result of an officer's willful act. Brendlin, 127 S. Ct. at 2405 (quoting Brower v. County of Inyo, 489 U.S. 593, 596 (1989) (ellipses and brackets omitted)). Thus, the conduct of officers who stop person "A" may, for purposes of the Fourth Amendment, effect a stop of person "B" as well, where a reasonable person in person "B's" shoes would conclude from the officers' conduct that he, too, was not free to leave.

This principle has found its application in cases where officers, by show of authority in seizing one person, also seize another. In United States v. Goddard, ___ F.3d ___, 2007 WL 1791093 (D.C. Cir. June 22, 2007), police officers approached a group of four men, among them the defendant, who were standing together. 2007 WL 1791093 at *1. As the officers approached, one of the men (not the defendant) started to walk away from the group. Id. As this man left, one of the officers spotted what he thought

15

was a gun.  Id.  The officer yelled, "gun!", and the officers simultaneously ordered the man who had been walking away from the group to return.  Id.  The Court of Appeals held that the defendant, who had not been walking away, also was seized, both because of the utterance of "gun," and because the officers had ordered the defendant's companion to return to the group.  Id. at *4 (noting that a command to "halt" is a show of authority suggesting a stop).  Similarly, in United States v. Alarcon-Gonzalez, 73 F.3d 289 (10th Cir. 1996), INS agents ordered the defendant's co-worker to "freeze," as he was holding a nail gun.  Id.  The Court of Appeals held that, "[a]lthough [the defendant] knew the command to 'freeze' was directed at [his co-worker]," because the defendant and his co-worker "were only five feet apart, and were obviously working together . . . . the command would communicate to both persons that they were not free to leave."  Id. at 289.[9]  In

---

[9]    Though the Tenth Circuit does not specifically say that the "command would communicate" passage was an application of the Supreme Court's seizure decisions, the language in Alarcon-Gonzalez mirrors that in Bostick where the Supreme Court held that a seizure occurs where "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."  Bostick, 501 U.S. at 437 (quotation omitted).

short, as the Fourth Circuit pointed out in <u>Weaver</u>,[10] a court considering the totality of the circumstances should take into account not only police conduct of officers that is directed to the defendant, but, where it is relevant, police conduct that is directed to other persons at the scene as well.

Bearing these features of the seizure inquiry in mind, we turn to the case at hand. Stewart and Alston were standing a few feet apart when officers Watson and Kielb approached in their police cruiser. Both officers got out of their car, and, according to the record, they approached Stewart and Alston quickly and authoritatively.[11]  A

---

[10]  <u>Weaver</u> listed among factors that may make up the "totality of the circumstances" "the officer's statements to other present during the encounter." <u>Weaver</u>, 282 F.2d at 310.

[11]  Watson's testimony establishes that the initial encounter unfolded in a matter of seconds:

> A:  As we were pulling into the store lot the males looked into the direction of the police vehicle and . . . they immediately, one turned towards back to the store and the other one kind of did an about face and started looking into the cleaners [sic].
> . . .
> Q:  What did you do then?
> A:  I don't recall exactly what was said. The one kind of going towards the store. We stopped him.

Tr. at 12.

reasonable person in Stewart's position would certainly conclude that the officers' activity was coordinated, and that it was directed at making inquiries of both Stewart and Alston who were together at the time of the approach by Watson and Kielb.

As Watson approached Stewart, Kielb overtook and intercepted Alston, who was walking away into the convenience store.   While Kielb did not testify, Watson stated that Kielb "stopped [Alston]. Said, we need to talk to you," Tr. at 12, and "brought [Alston] back" from the store's entrance towards Stewart and Watson.   Tr. at 45. Considering the circumstances, a reasonable person in Stewart's position[12] would have believed that Alston had been seized, and was not free to leave:  a police car pulls up to the place where two men are standing; as one of the men starts to walk away from that place to enter a store, a

---

[12]   The record does not make clear precisely where Stewart was standing when Kielb overtook Alston, but it is reasonable to conclude from the alacrity of the police conduct and the original proximity of Stewart and Alston that Stewart observed what had transpired in the encounter between Kielb and Alston.   The laundromat's entire width is around four perpendicular parking spaces, and the entrance to the convenience store is in the center of the building, adjacent to the right side of the laundromat.   Watson's testimony shows that Kielb spoke to Alston before Alston was able to enter the store.   Watson and Stewart were standing in roughly the same place, so it is reasonable to conclude that Stewart witnessed the encounter as well.

police officer in the car gets out and moves toward him quickly enough to overtake and intercept him;[13] the officer then "stops" him, tells him "we need to talk to you,"[14] and begins to escort him back toward the exact place from which he had started that brief journey and where Stewart was then standing.

From these circumstances, a reasonable person in Stewart's position would conclude from the officers' conduct that, if he attempted to leave, as Alston had, he would be "likely to prompt an objection" from Watson.

---

[13] Kielb would have to have moved particularly swiftly to overtake Alston. Kielb was driving, Tr. at 11, so to intercept Alston he had to exit the driver's side door (on the left side of the car) and then move across the patrol car toward the entrance of the convenience store, which was to the right of the laundromat.

[14] Kielb's use of "need," as characterized by Watson's testimony, is important to the assessment of the encounter. "Need" typically expresses a demand, not a request. See United States v. Campbell, 486 F.3d 949, 956 (6th Cir. 2007) (distinguishing officer's statement that he would "like" to see defendant's identification, which is less indicative of a seizure, from "need" or "want," which would have been more indicative of a seizure).

Also, "you" is an ambiguous pronoun that can be singular, indicating Alston, or plural, indicating Alston and Stewart. "We," on the other hand, is much less ambiguous, rather clearly indicating that both Watson and Kielb need to talk. Combined, "we" and "you," taken in the context in which those words were used, show that Kielb was telling Alston that Kielb and Watson needed to talk with Alston and Stewart. That is confirmed by Kielb's conduct in escorting Alston back to where Stewart was located.

Brendlin, 127 S. Ct. at 2407. Stewart and Alston had been doing exactly the same thing--facing each other and talking, in place--when the police officers arrived. There was no reason, based on Stewart's and Alston's behavior, for the police officers to take a special interest in Alston as opposed to Stewart. Indeed, the officers gave every appearance of acting like a team whose coordinated goal was to investigate both men; Watson happened to take one suspect, and Kielb the other. Kielb ordered Alston to stop so that the officers could talk to him, using language which indicated that both officers needed to talk to both men, and Watson began to question Stewart, evidently initiating the exact investigation for which Kielb saw fit to stop Alston. Taking into account these circumstances, it would be difficult for a reasonable person in Stewart's position to think anything but that, if he attempted to break off his encounter with Watson, Watson, as Kielb had done with Alston, would object to Stewart's departure and require him to stay.

Considering the totality of the circumstances, Watson's and Kielb's conduct would have communicated to a reasonable person in Stewart's position that he was not free to ignore the officers' presence and go about his

business.    Therefore,   for   the   purposes   of   the   Fourth
Amendment analysis to be made here, Stewart was seized when
Kielb   intercepted   Alston   and   Watson   simultaneously
approached Stewart and began to question him.

**B.    Was the Seizure Unreasonable?**

The   protection   of   the   Fourth   Amendment   does   "not,   of
course . . . guarantee against all . . . seizures, but only
against   unreasonable   .   .   .   seizures,"   United   States   v.
Sharpe,   470   U.S.   675,   682   (1985),   and   evidence   is   only
suppressed   where   it   is   the   product   of   an   unreasonable
seizure.    Segura   v.   United   States,   468   U.S.   796,   804
(1984).    Therefore,   the   Court   must   determine   whether   the
officers' seizure was unreasonable.

An   officer   may   stop   and   briefly   detain   a   person   for
investigative   purposes   when   there   is   "reasonable
suspicion,"   based   on   articulable   facts,   that   criminal
activity is afoot.   United States v. Sokolow, 490 U.S. 1, 7
(1989).    Whether   there   is   reasonable   suspicion   depends   on
the   totality   of   the   circumstances   known   to   the   officer   at
the   time   the   stop   is   made,   along   with   any   reasonable
inferences   to   be   drawn   at   the   time   of   the   stop.    United
States   v.   Crittendon,   883   F.2d   326,   328   (4th   Cir.   1989).
The   Fourth   Circuit   calls   "reasonable   suspicion"   a   "common-

sensical proposition . . . [which] credit[s] the practical experience of officers who observe on a daily basis what transpires on the street." <u>United States v. Lender</u>, 985 F.2d 151, 154 (4th Cir. 1993). At the same time, officers may not stop a person on the strength of an "inchoate and unparticularized suspicion or 'hunch.'" <u>Terry</u>, 392 U.S. at 37. Rather, "reasonable suspicion" must include "particularized evidence that . . . criminal activity is afoot." <u>United States v. Sprinkle</u>, 106 F.3d 613, 618-19 (4th Cir. 1997).

In this case, the record shows that Watson made the following observations before Stewart was seized. Around 6:00 p.m., Watson saw two men standing in front of a closed laundromat that was next to an open convenience store with "No Trespassing" and "No Loitering" signs. Before he approached them in his car, he saw them for a matter of a few seconds. The men did not appear to be making any motions; rather, they were facing each other, standing still, and appeared to be talking to each other. When the officers approached in their car, one man (Alston) began to walk toward the convenience store's entrance and the other (Stewart) turned around and began reading flyers in the

laundromat's window.   Watson then approached Stewart and, as the Court has concluded above, seized him.

The Government grounds the reasonableness of Stewart's seizure on suspicion of two crimes: trespassing and drug dealing.   The Court addresses each in turn.

### a. Trespassing

Virginia law criminalizes trespass by those who willfully go on the property of another "without authority of law" after "having been forbidden to do so" by the lawful possessor, "either orally or in writing" or "by a sign or signs" posted by the lawful possessor.   Va. Code Ann. § 18.2-119.   In this case, no-trespassing signs were posted at the entrance of an open convenience store.   The convenience store's patrons are invitees, who are obviously not trespassers.   Cf. Raab v. Commonwealth, 644 S.E.2d 78 (Va. Ct. App. 2007) (where sign stated that parking lot was for "patrons only," only non-patrons were trespassers).   Therefore, reasonable suspicion to make a stop for trespassing must be based on more than a person's mere presence at the store.

While the Court has found, and the parties have cited, no Virginia decisions setting out the elements of a § 18.2-

119 violation in such public circumstances,[15] Virginia decisions in two suppression motions similar to this one are instructive.   In Ewell v. Commonwealth, 491 S.E.2d 721 (Va. 1997), an apartment complex in a high drug-trafficking area had posted no-trespassing signs, which permitted entry to residents and their guests, but forbade others.   A police officer patrolling the parking lot at the complex around 12:30 a.m. spotted an automobile that he did not recognize.   When the officer arrived, the automobile attempted to leave, and as it passed by the officer, he saw a driver whom he did not recognize.   The officer then stopped the car.   The Supreme Court of Virginia held that the officer did not have reasonable suspicion to believe that the defendant was trespassing because the defendant "acted as any other person might have acted under similar circumstances."   491 S.E.2d at 723.

     The Raab decision sheds some light on Ewell's holding. In Raab, people frequently used a restaurant's parking lot to go to a nearby beach, so the restaurant posted "patrons only" signs in its parking lot.   At about 12:40 a.m., a

---

[15]   One decision, without comment, upheld a stop leading to an arrest where the police officer had seen the defendant, with no business at the store, loiter in and around the store's parking lot for 10 minutes.   Coppedge v. Commonwealth, 2005 WL 86466 (Va. Ct. App. Jan 18, 2005).

police officer, who was passing by the restaurant, saw three cars in the lot. The restaurant was closed and all its lights were off. The officer stopped one of the cars as it was leaving the lot. The defendant argued that, under Ewell, the officer lacked reasonable suspicion to stop him. The Virginia Court of Appeals disagreed, and distinguished Ewell by noting, "Apartment complexes do not close for the night. Residents and guests come and go as they please. Restaurants, on the other hand, can and do close to everyone. Patrons do not come and go from a closed, unlit restaurant in the middle of the night." 644 S.E.2d at 82 (emphasis original).

Considering the totality of the circumstances in light of the Ewell and Raab decisions applying Virginia's trespass statute, it is rather clear that Watson did not have a reasonable suspicion based on articulable facts that Stewart and Alston were trespassing in violation of the statute. Stewart and Alston were in a high-crime area, but they were near the door of an open convenience store around 6:00 p.m.--an entirely natural time, even a busy time, for the making of purchases at convenience stores. Beyond this, Watson only stated that the pair appeared to be "hanging out," that is, that they were not moving and had

thus appeared not to be patrons, but rather trespassers. However, that observation, based as it was on such a short (few seconds) duration, hardly supports the view that there was a violation of the trespassing law, especially where the individuals were talking and, at the time the police approached, one of them actually headed toward the store's entrance at a time of day when purchases were common-place. The observation certainly is not itself an articulable fact sufficient to permit the officers reasonably to suspect that Stewart and Alston were trespassing. Thus, the officers did not have particularized, articulable facts that justify a <u>Terry</u> stop under the Fourth Amendment on the theory that Alston and Stewart were engaged in the criminal activity of trespassing.

### b. Drug Distribution

Police saw Stewart and Alston facing each other and engaged in conversation early in the evening, next to a convenience store which was located in a high crime area and which previously had reported incidents involving drugs and guns. When the police approached the men, Alston walked toward the convenience store's entrance, and Stewart turned around to look at flyers in the laundromat's window. The situation confronting police when they seized Stewart

26

did not bespeak that he was then, or recently had been engaged, in drug-related activity, notwithstanding that the behavior appeared to be somewhat unusual.   Bearing in mind the Supreme Court's commonition that "the mosaic which is analyzed for a reasonable-suspicion . . . inquiry is multifaceted, [and] one determination will seldom be a useful precedent for another," Ornelas v. United States, 517 U.S. 690, 698 (1996), the Court looks to the Fourth Circuit's analyses of similar circumstances to guide it here.

In United States v. Lender, 985 F.2d 151 (4th Cir. 1993), two officers were on patrol at 12:50 a.m. in an area known for heavy drug trafficking.   They saw a group of four or five men, including the defendant, "huddled" on a street corner.   The defendant "had his hand stuck out with his palm up, and the other men were looking down towards his palm."   985 F.2d at 153.   As the officers approached, the men began to disperse.   As the defendant was walking away from the officers, they "observed him bring his hands to the front of his waist as though reaching for or fumbling with something in that area."   Id.   The defendant argued that the officers did not have reasonable suspicion to stop him at that point.   The Court of Appeals disagreed, holding

27

that, based on the totality of the circumstances, the officers had reasonable suspicion that criminal activity was afoot. These circumstances were that the officers observed the "defendant engaged in behavior that they suspected to be a drug transaction" late at night in a known trafficking area, and the defendant's evasive behavior, i.e., walking away from the officers as they approached. Id.

In United States v. Sprinkle, 106 F.3d 613 (1997), police officers were in an area known for "considerable narcotics trafficking" around 5:30 p.m. when they saw a man (Poindexter) sitting in a car. One of the officers, who was Poindexter's nephew, knew that Poindexter had served time for narcotics violations and recently had been released from prison, though he knew of no reports that Poindexter was currently suspected of criminal activity. Seconds later, the officers saw the defendant (Sprinkle), leave a dwelling and join Poindexter in the car. The officers walked past the car, and noticed Sprinkle

> huddling and talking to Poindexter. Specifically, they were huddled to the center of the console of the vehicle with their hands close together. [One officer] believed that Sprinkle was passing or about to pass Poindexter something. When Poindexter saw [his nephew, the officer] he put his head down and put his hand to

> the left side of his face as if to conceal his
> face from [the officer] seeing him.

United States v. Sprinkle, 106 F.3d at 616 (quotations and original brackets omitted).  At the same time, the officers could "see inside the car and saw everybody's hands," and "did not see anything in either man's hands."   Id. (quotations omitted).  Additionally, the officers did not see Poindexter or Sprinkle "make any movement that indicated an attempt to conceal any object inside the car." Id.  As the officers "hurried on foot to their own cars" Poindexter started his car and pulled into the street, driving in a "normal, unsuspicious fashion."   Id.  The officers then stopped the car, and Sprinkle was charged on evidence discovered thereafter.

Relying on Lender,[16] the United States argued that the officers had reasonable suspicion considering Poindexter's criminal history, the criminality of the neighborhood, the huddling in the car, Poindexter's effort to cover his face as the officers walked by, and the men's driving away as the officers went for their cars.  The Court of Appeals rejected this argument.  While it agreed that all these factors ought to weigh in the consideration of the totality

---

[16]    The Court of appeals noted the reliance on Lender in a footnote.  Sprinkle, 106 F.3d at 618 n.3.

of the circumstances, it held that the police had insufficient information to stop the car. Chiefly, the Court noted that, unlike Lender, the police could see that Poindexter's and Sprinkle's hands were empty in the car. "In other words," as the Court put it, police "could actually see that nothing of a criminal nature was happening in the car." Id. at 618.[17] The Court agreed that Poindexter's driving away from the police could be considered in the totality of the circumstances, but noted that this was less indicative of criminal activity because he drove away in an unhurried manner and that it was not unusual for a car to pull away once a passenger had entered the car. Id. Finally, the Court agreed that Poindexter's effort to hide his face was suspicious. "Nevertheless," the Court concluded, "without some stronger indication of criminal activity this act cannot tip this case to reasonable suspicion." Id.

In United States v. Sims, 296 F.3d 284 (4th Cir. 2002), Officer England received a complaint that a black male wearing a T-shirt and blue jeans had fired a shot at 809½ Oakland Street. While England was searching the area,

---

[17]   Sprinkle distinguished Lender because, "although police could not see . . . into Lender's open hand, the fact that several men were looking to his hand indicated there was actually something in it." 106 F.3d at 618 n.3.

he looked across a lot to 813 Oakland Street and "saw a black male behind 813 [Oakland Street] in a crouched position, peeking around the corner . . . looking towards [England].  As soon as England made eye contact, the man jerk[ed] right back behind the house, out of England's view."  296 F.3d at 286 (quotations omitted).  The officer pursued, and when he rounded the corner, he saw the defendant, a black male wearing a white T-shirt and jeans. Id.  The officer then seized the defendant by ordering him to submit at gunpoint.  The Court of Appeals held that the seizure was based on reasonable suspicion:  the defendant matched the caller's description, he was a short distance from where the shot had recently been fired, and he was very evasive.  Id. at 287.  The Court made clear, however, that it reached that conclusion based on the totality of the circumstances.  It observed that the tip itself would not have been enough, and that "[i]n particular, Sims's behavior, while apparently evasive, was well short of 'headlong flight' and might not have given rise to reasonable suspicion in a different context."  Id.

These decisions teach that, while evasive behavior is frequently a pertinent factor for courts to consider in assessing the totality of the circumstances, that factor

cannot be given too much weight where it is unconnected to other particularized indications of criminal activity. The decisions also instruct that not all unusual activity is of sufficient strength to establish a reasonable suspicion that criminal activity is afoot.

In this case, while Stewart's reaction to the police was somewhat odd and might even be characterized as evasive, it was not remarkably so, given that it would be consistent with a person's decision to wait outside a store while a friend entered to make a purchase. More importantly, though, it stands almost alone. While the police encountered Stewart in a high-crime area, they observed him only for a few seconds standing next to an open convenience store at an hour when it is entirely natural for a law-abiding citizen to patronize such a place and make purchases. And, of equal importance, neither Alston nor Stewart engaged in any unusual activity during that brief period of observation. While Watson's statement that it seemed to him as though the two men were "hanging out" is certainly relevant to the analysis, what Watson saw in the few seconds he observed the men is also consistent with two people discussing what to buy before one goes in to make a purchase. Furthermore, Watson witnessed no

movement between Stewart and Alston that would indicate that a drug transaction had just been conducted, was being conducted, or was about to be conducted.   Without a "stronger indication of criminal activity," <u>Sprinkle</u>, 106 F.3d at 618, Stewart's act of turning around and reading flyers while Alston walked towards the store cannot tip his actions into reasonable suspicion that drug distribution was afoot.

## CONCLUSION

The officers' seizure of Stewart was not supported by reasonable suspicion of criminal activity sufficient to justify a stop under the Fourth Amendment.   The evidence discovered as fruits of the ensuing search--a gun, drugs, and Stewart's statements to the officers--therefore cannot be used as evidence.   The Court will therefore grant Stewart's motion to suppress the evidence that was the yield of the unlawful seizure.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record by facsimile and regular mail.

It is so ORDERED.

                                    /s/
                        _____
                        Robert E. Payne
                        Senior United States District Judge

Richmond, Virginia
Date: August 22, 2007